[Cite as *State v. White*, 2019-Ohio-243.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals Nos. L-17-1196
                                                                      L-17-1197
            Appellee                                                  L-17-1198

v.                                               Trial Court Nos. CR0201701504
                                                                  CR0201701126
Michael Edward White                                              CR0201701161

            Appellant                            **DECISION AND JUDGMENT**

                                                 Decided:  January 25, 2019

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Alyssa Breyman, Assistant Prosecuting Attorney, for appellee.

Karin L. Coble, for appellant.

* * * * *

**SINGER, J.**

{¶ 1} In this consolidated appeal, appellant, Michael Edward White, challenges

the July 13, 2017 judgments of the Lucas County Court of Common Pleas.  For the

reasons that follow, we affirm the judgments of the trial court.

**{¶ 2}** Appellant sets forth three assignments of error:

Assignment of Error One: Appellant's convictions for bribery are not supported by sufficient evidence and are against the manifest weight of the evidence.

Assignment of Error Two: The conviction for felonious assault is not supported by sufficient evidence and is against the manifest weight of the evidence.

Assignment of Error Three: The conviction for burglary is unsupported by sufficient evidence and is against the manifest weight of the evidence.

## Procedural Background

**{¶ 3}** Appellant was indicted in case No. CR0201701126, on January 19, 2017, on one count of burglary with respect to P., appellant's former girlfriend.

**{¶ 4}** On January 25, 2017, appellant was indicted in case No. CR0201701161, on one count of felonious assault and one count of robbery with respect to J., the mother of appellant's children.

**{¶ 5}** On March 16, 2017, appellant was indicted in case No. CR0201701504, on one count of aggravated burglary, one count of intimidation of a witness, and two counts of bribery with respect to J.

**{¶ 6}** On June 26, 2017, the cases were tried and on June 29, 2017, the jury found appellant guilty of burglary, felonious assault, intimidation of a witness and two counts of

2.

bribery. Appellant was found not guilty of robbery, and the jury could not reach a unanimous verdict on the aggravated burglary charge.

{¶ 7} On July 13, 2017, appellant was sentenced to three years in prison on the burglary conviction, six years on the felonious assault conviction, to be served concurrently to the sentence imposed for burglary, and twelve months on the intimidation of a witness conviction as well as twelve months on each of the two bribery convictions, all to be served concurrently. Appellant timely appealed, arguing his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence.

{¶ 8} For ease of discussion, we will examine appellant's assignments of error in reverse order.

**Standard of Review**

{¶ 9} In a criminal case, a verdict may be overturned on appeal if it is either against the manifest weight of the evidence or there is an insufficiency of evidence. "[S]ufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). So, the proper analysis is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, (*superseded by statute and constitutional amendment on other grounds*). (Additional citations omitted.)

3.

{¶ 10} The standard of review for manifest weight is the same in both criminal and civil cases, and an appellate court's function is to determine whether the greater amount of credible evidence supports the verdict. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, paragraph four of the syllabus; *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. The appellate court must "examine the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses, and determine whether the jury 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Tibbetts*, 92 Ohio St.3d 146, 163, 749 N.E.2d 226 (2001), quoting *Thompkins* at 387.

### Third Assignment of Error

{¶ 11} Appellant argues his conviction for the burglary of P.'s home is not supported by sufficient evidence and is against the manifest weight of the evidence.

{¶ 12} Appellant was convicted of burglary, pursuant to R.C. 2911.12(A)(2), which states in relevant part that "[n]o person, by force, stealth, or deception, shall * * * [t]respass in an occupied structure * * * that is a permanent or temporary habitation of any person when any person * * * is present or likely to be present, with purpose to commit in the habitation any criminal offense * * *."

### Appellant's Relationship with P.

{¶ 13} The evidence presented at trial shows appellant was in a relationship with P. from approximately July 2015 until October 2016, during which time appellant was welcome at P.'s rented home, but his name was not on the lease. The couple broke up

4.

due to the involvement of Children's Services Board ("CSB") with P. and her children. P.'s children had previously been removed from her home, and in order for the children to return home, P. was required to end her relationship with appellant.

{¶ 14} Despite the break up, appellant continued to contact P., and the couple would see each other occasionally. Appellant stayed at P.'s home, off and on, for about two weeks in late December 2016, and brought some clothes and an Xbox with him.

{¶ 15} On December 30, 2016, appellant spent the night at P.'s home. P. testified when she woke up on December 31, 2016, she did not feel well. Nevertheless, in the early afternoon, P. drove appellant to a barbershop. Appellant wanted P. to wait for him while he was in the barbershop, but P. refused and left.

{¶ 16} P. then received numerous calls and text messages from appellant which she described as "harassment about I'm going to be sorry if I don't pick him back up." Appellant was using someone else's phone, as he claimed his phone was in the car P. was driving. One text message from appellant to P. stated, "I'm go [sic] slap the f*** out of you period if I have too [sic] not have my phone." P. replied, "[a]nd that's why we're over, I'm not putting up with your abuse anymore." Another text from appellant to P. said, "I'm gonna put you in general Hospital. Period. Man and if you run I'm gonna take everything. Out of your house I don't want too [sic] so."

{¶ 17} P. felt scared and sick to her stomach so she drove to a nearby police station to report the harassing and threatening texts, and to file charges against appellant.

P. was afraid to go home and see appellant there so P. went to her mother's house to stay. P. fell asleep around 10:00 p.m.

### The Incident of January 1, 2017, and Subsequent Investigation

{¶ 18} P. testified that on the morning of January 1, 2017, when she awoke, she noticed appellant had called her cell phone repeatedly from her home phone number as well as from a private number. When P. received a call from her home number, she answered the call and it was appellant. P. said appellant was angry and cursing and said he would hurt her and break her stuff.

{¶ 19} Shortly after appellant and P. talked, P. left her mother's house, called 911 and asked that the police meet her at her home. The police met P. at her home and two officers went inside but found no one there. The back door of P.'s home was broken, but it had been in that condition since August 2016, when appellant broke it. According to P., the door would shut, but you could still push the door open. When the police allowed P. to go into her home, she found her television, computer, dining room light fixture and other items broken and thrown about. P. gathered a few of her belongings, left her home and went to her mother's house.

{¶ 20} On January 4, 2017, P. returned to her home with a detective, who conducted an investigation and took pictures of the damage. P. said none of appellant's personal items were in her home. However, a man's watch was found in her son's room which P. said was weird because she did not recognize the watch and appellant did not wear a watch.

6.

{¶ 21} Detective William White with the Toledo Police Department ("TPD") testified at trial regarding his investigation of the burglary of P.'s home. Thereafter, a warrant was issued for appellant's arrest; appellant was ultimately arrested and booked in the jail. P. had stayed at her mother's house until appellant was in custody. P. then returned to her home and moved all of her belongings out of the home.

{¶ 22} Detective White also testified about his access to recorded jail phone calls. He explained when an inmate is booked into the Lucas County Jail, the inmate is given a personal identification number ("pin number") to make phone calls. The system which records the calls and logs the numbers allows the detective to search by inmate name, inmate pin number, outgoing phone number and cell block. The detective listened to appellant's calls. In one jail call, appellant was talking to J., his children's mother, about P. showing up at court. Appellant said P. was "trying to f** sink me. I ain't [sic] break into no [sic] m**f** house. Everyone know [sic] I lived there." In other calls, appellant asked his brother and B., a girlfriend, to call P. and tell her not to come to court.

{¶ 23} Appellant testified he was not in P.'s home on January 1, 2017, he used an app called Spoof on his brother's phone when he called P. to make it seem like he was calling her from her home phone number so she would answer the call. During his testimony, appellant acknowledged he was living with P. on December 31, 2016, and January 1, 2017, as he said, "I was living there for almost two years straight. I did not never not [sic] stay with her. She wouldn't allow that." Appellant also conceded he was living at a residence on Oakland Street during the same time frame. He stated,

7.

"[a]bsolutely, yeah. No furniture was at East Oakland * * * the gas or electronic [sic] wasn't on * * * if there was somebody at that house, they would froze to death [sic] because it was freezing in that house. * * * Nobody was living there, but the house was my house." Appellant further testified, "I lived there. I lived, I lived there, but it was [sic] no reason for me to be there * * * I lived there all the way from the time of December in to January and I also lived with [P.] * * * I stayed there a couple nights, but it wasn't * * * overnight. Yeah, it was freezing in there, absolutely."

### Arguments

{¶ 24} Appellant argues the state presented no evidence that someone was objectively likely to be in P.'s home at the time he entered. Appellant observes after P. dropped him off at the barbershop, she went to her mother's house where P.'s children lived. Appellant asserts when he allegedly entered P.'s home, the car P. drove was not there, which he would have seen and he would have known that P. was not home. Appellant contends there was no testimony that P. or anyone else was more than 50 percent likely to be home. Appellant notes the day in question was a Saturday and New Year's Eve, and there was no evidence as to whether P. worked on Saturdays, or if it was likely that P. would be home on a Saturday. Appellant claims P. agreed there was no likelihood that he would know she would be home.

{¶ 25} Appellant also argues there is insufficient evidence that he entered P.'s home with the intent to commit a separate criminal offense. Appellant maintains if it was his intent to enter P.'s home to retrieve his clothes, he may have trespassed, "but trespass

8.

alone is insufficient for burglary." Appellant contends the evidence does not show he entered P.'s home with the specific intent to commit an offense separate from trespass. Rather, he asserts "it was only when appellant called [P.] from [P.'s] apartment phone that he threatened to break [P.'s] things if she did not return." Appellant submits property was damaged, but the state had to prove he intended to damage property at the time he entered the home, and the state did not do so.

{¶ 26} The state counters P. was likely to be present in her home when appellant entered as P. testified she was "more of a homebody" and she woke up with the flu on December 31, 2016, and did not want to do anything. The state claims appellant intended to assault P. when he entered her home, as evidenced by the text messages he sent to her. The state further argues even if the jury believed appellant's testimony that he entered P.'s home to retrieve his clothes, the evidence shows that once inside, he committed criminal damaging by breaking P.'s property. The state asserts the element of "purpose to commit a crime" can be satisfied when the intent is formed at any time during the trespass.

**Law**

{¶ 27} Trespass, which is an element of burglary, occurs when a person knowingly enters the premises of another without privilege. R.C. 2911.21(A)(1). The "likely to be present" element of the burglary statute is satisfied "[w]here the state proves that an occupied structure is a permanent dwelling house which is regularly inhabited, that the occupying family was in and out on the day in question, and that such house was

9.

burglarized when the family was temporarily absent." *State v. Kilby*, 50 Ohio St.2d 21, 361 N.E.2d 1336 (1977), paragraph one of the syllabus. The "purpose to commit in the habitation any criminal offense" element of R.C. 2911.12(A)(2) may be formed "at any point during the course of a trespass." *State v. Fontes*, 87 Ohio St.3d 527, 721 N.E.2d 1037 (2000), syllabus. The holding in *Fontes* applies to cases involving aggravated burglary or burglary, as both the aggravated burglary statute and the burglary statute require the state to prove the offender trespassed "with the purpose to commit * * * any criminal offense." *See State v. Jones*, 3d Dist. Allen No. 1-04-53, 2005-Ohio-6859, ¶ 20.

**Analysis**

{¶ 28} Upon review of all of the evidence presented at trial, in a light most favorable to the state, we find that any rational trier of fact could have found the essential elements of burglary proven beyond a reasonable doubt.

{¶ 29} As to the trespass element, the state presented evidence which placed appellant in P.'s home on January 1, 2017, angry and uninvited. This evidence included phone calls appellant made from P.'s home number to P., about which P. testified, as well as recorded jail phone calls. Based on all of the evidence presented, we find there was sufficient evidence for the jury to conclude that appellant trespassed into P.'s home.

{¶ 30} As to the "likely to be present" element, the state presented evidence which included P.'s testimony that she resided in her home for over a year, she was a homebody, she woke up with the onset of the flu on December 31, 2016, and did not want to get off of the couch, but nevertheless left her home to drive appellant to the

10.

barbershop. Construing this evidence, as well as all of the evidence, in a light most favorable to the state, we find there was sufficient evidence for the jury to conclude that appellant trespassed into P.'s home when someone was likely to be present.

{¶ 31} Concerning the "purpose to commit * * * any criminal offense" element, the state presented evidence that appellant possessed the intent to commit criminal damaging while trespassing in P.'s home. This evidence included P.'s testimony that appellant called her on January 1, 2017, from her home phone number and said he would break her TV, break her computer and break everything in her house. The state also introduced P.'s phone bill which showed numerous calls made from P.'s home phone to her cell phone on January 1, 2017. Viewing all of the evidence in a light most favorable to the state, we find there was sufficient evidence from which the jury could conclude that while appellant was trespassing in P.'s home he damaged her property and committed a criminal offense.

{¶ 32} In light of the foregoing, we conclude there was sufficient evidence to support appellant's burglary conviction.

{¶ 33} Further, appellant's conviction for the burglary of P.'s home is not against the manifest weight of the evidence. P.'s testimony, appellant's jail calls and P.'s phone bill all indicate that appellant entered P.'s home without permission while P. was likely to be home, and he damaged property in her home. The jury heard appellant's testimony and clearly chose to disbelieve it. After reviewing the record and weighing all of the evidence, we find nothing in the record which shows the jury lost its way and committed

11.

a manifest miscarriage of justice in convicting appellant of burglary. Accordingly, appellant's third assignment of error is not well-taken.

## Second Assignment of Error

{¶ 34} Appellant contends his conviction for the felonious assault of J. is not supported by sufficient evidence and is against the manifest weight of the evidence.

## Appellant's Relationship with J.

{¶ 35} Evidence offered at trial shows appellant was in a relationship with J. for about eleven years. The couple lived together and had three children, although they never married. The couple's relationship ended in about 2015.

{¶ 36} In December 2016, appellant entered into a lease for a residence on Oakland Street, and he received a key to the residence. At that time, due to a situation with CSB, appellant was not allowed to be near his three children. Sometime after January 4, 2017, appellant was in custody until he was released on January 15, 2017. During that time, J. and the three children lived in the Oakland residence.

## The Incident of January 15, 2017, and Subsequent Investigation

{¶ 37} J. testified at trial that on the evening of January 15, 2017, she was at the Oakland residence with the children. J. was in the shower when the children told her someone was at the door. J. got out of the shower and put a towel on to go answer the door. J. was expecting a male friend and not appellant because J. thought appellant was still incarcerated. However, when J. opened the door, appellant was there. The children screamed out in excitement, "Daddy," but appellant said nothing. Appellant hit J. in the

12.

face with his fist, she fell and lost consciousness. The next thing J. remembered was waking up on the back porch, dressed in a shirt and shorts, with appellant pouring water on her and she was in pain and hurt everywhere.

{¶ 38} After appellant left, J. got up and ran to her neighbor's house next door to get help. An ambulance arrived and took J. and her children to the hospital. J. suffered injuries to her mouth, including losing her front tooth, as well as bruises all over and scratches. It was recommended that J. be admitted to the hospital, but because she had no one to watch her children, she and her children left the hospital. When J. got home, she noticed blood on the carpet and window blinds; she assumed it was her blood. The next day, J. returned to the hospital because she was light-headed, could not stand up and could not really see.

{¶ 39} J. testified she did not have any injuries before appellant came to her house on January 15, 2017. J. stated she has received treatment and will require more treatment from a dentist to repair four of her teeth.

{¶ 40} Appellant testified he rented the Oakland residence in December 2016, with money given to him by his aunt. Appellant said "it [sic] was nothing in the house. Not one piece of furniture." When asked why J. was at the Oakland residence on January 15, 2017, appellant stated "I can only insinuate [sic] that she there to use the shower. I had just got [sic] the bills cut on in January * * * the gas and the electricity wasn't [sic] on."

{¶ 41} Appellant said he went to the Oakland residence on the night of the incident and saw a "so-called business associate" of J. coming off of the porch, and appellant asked the man what he was doing at the house. The men exchanged words and appellant struck the man and a physical altercation ensued. Appellant testified that during the fight, "I knew [J.] opened up the door just off [sic] my senses. I didn't see her. I didn't know it was her. Because at that point she hit me in the back of my head * * * while I'm on top of him, you know. And she grabbed me by the face and tried to pry me off of him." Appellant continued "I kept hitting him and then she hit me again and grabbed me and I did like this to her again like shoved her hard, like get up off [sic] me. * * * [H]e got up and said I'm going to get the gun. * * * So that's when I booked, I ran in the house and [J.] * * * was in front of the door crying and I basically ran her over to get in the house to shut the door." Appellant explained he grabbed his cell phone, which J. bought for him, from the table, but at the hospital, the cell phone was taken from him by the police because J. said it was her phone.

{¶ 42} Appellant testified he never struck J. Appellant said J. received a black eye and bruises from a fight she was in with a woman in December 2016. Appellant stated his children were upstairs but heard his voice after he bulldozed or ran over J. and grabbed his cell phone off of the table. The children said, "Daddy," but he told them to go back upstairs, shut the door and do not come out of the room.

{¶ 43} J.'s neighbor testified that at about 10:00 p.m. on January 15, 2017, the girl from next door came to his door. When he opened the door, she pushed him, ran in and

14.

shut the door. He said she was soaking wet, had a bloody lip, and was "[k]ind of crying, just looked real upset. * * * She said that her boyfriend beat her up." Then, a tall black man knocked on the door and asked if his girlfriend was there. The neighbor told the man she was not there. The man did not leave; he was "bouncing around on [the neighbor's] porch. * * * Kind of wound up, kind of like aggravated." The neighbor called the police.

{¶ 44} TPD Officer Paul Davis testified he responded to a domestic violence incident at the Oakland Street residence. He was directed to J. and "[h]er entire face was swollen, there were scratches all over her face and bruises. She was missing a tooth, front tooth. Her lips had cuts on them and were bloody and she had bruises about her arms and legs." The officer described J. as "hysterically crying and extremely emotionally upset." He testified J. "stated the father of her children had assaulted her." Officer Davis went to the hospital "[t]o standby with the victim." While there, the officer was notified that appellant had arrived at the hospital "and checked himself in." The officer approached appellant and described "[t]here were splotches of blood all over the front of his pants, and his right pinky knuckle was cut." As appellant was being taken into custody, the officer found a cell phone in appellant's jacket pocket which belonged to J. The officer estimated that appellant was about five feet, eleven inches tall.

{¶ 45} TPD Detective Michael Murphy testified he was at the hospital and observed J. who was "very distraught * * * she was crying, very upset. She had some pretty significant injuries. She's very bruised up, cut. She had a tooth missing. Bleeding

from her mouth.  Bruises all over her face, on her arms."  The detective spoke with J. who stated she

> heard somebody banging on her door and when she answered the door * * * her ex was just standing there and hit her in the face, knocked her to the ground.  At some point she lost consciousness.  He had drug her through the house. * * * She came to * * * on the back porch with him pouring water over her. * * * She was able to at some point run to the neighbors and call 911.

J. told the detective that appellant took her cell phone.

{¶ 46} Detective Murphy also saw appellant at the hospital and noticed appellant's jeans had blood on them and he had a cut on his knuckles.  In addition, appellant had J.'s cell phone in his possession.  Later, at the safety building, the detective interviewed appellant and appellant said he lived in Napoleon, Ohio, and he was not at the Oakland Street residence on the night of the incident.

{¶ 47} At trial, when appellant was asked if he told Detective Murphy he was not at the Oakland residence on the night in question, appellant testified, "Well I didn't tell - - I told Detective Murphy, you know, he basically was - - me and him never had a relationship as far as communication."  Appellant testified he "didn't intentionally hurt no one [sic] * * * her teeth has [sic] been knocked out since she was 11 years old.  She been keeping [sic] her teeth in with denture grips [sic ] since I been knowing her [sic] * * * I don't think I caused these injuries at all."

16.

**{¶ 48}** J.'s medical records reveal that on January 15, 2017, she was evaluated by a trauma team at the hospital and numerous tests, scans and x-rays were performed. In the history section it states "she heard someone knocking at her front door. She opened the door and her children's father was there and assaulted her. * * * She was punched in the face multiple times and did have a LOC [loss of consciousness]. * * * Children at bedside and state that she was kicked in the belly and back as well." J. complained of a headache, lower back pain, generalized achiness and soreness, and her right arm hurt and was bruised. It was recommended that J. be admitted to the hospital for 24 hours for concussion checks, but she refused because she could find no one to watch her children.

**{¶ 49}** The next day, J. returned to the hospital complaining of a headache, nausea, vomiting, lightheadedness and persistent pain in her left lower abdominal pain. It was noted that J. "has multiple bruising to face, left side of neck, left side of chest and shoulder." The medical records list J.'s height as five feet, four inches.

**{¶ 50}** Pictures taken at the hospital depict J.'s injuries including a swollen, bloody cut lip, a missing front tooth, scratches and bruises on the left side of her face, neck and ear, and bruises on her left wrist and arm. Pictures taken of appellant at the hospital show blood on his jeans and cuts on his right hand.

**{¶ 51}** During recorded jail calls that appellant made to J., J. said, "I opened up the door and got my ass beat. * * * You almost just killed me * * * fractured the left side of my face * * * two teeth knocked out * * * all because of jealousy." J. said the police knew who appellant was in the hospital because their daughter told the detective what

17.

appellant was wearing. Appellant apologized to J. and said, "[o]ne thing led to another * * * I wasn't supposed to be over there. * * * I saw that man * * * he wasn't supposed to be in that house. * * * I am truly sorry. I wasn't trying to kill nobody."

{¶ 52} Detective White also testified about a jail phone call made by appellant from another inmate's pin number, so that appellant and B., a girlfriend, could get their stories straight without being monitored by police.

**Arguments**

{¶ 53} Appellant argues he did not inflict serious physical harm on J. Appellant asserts J. was not admitted to the hospital, but did return to the hospital the next day because she could not stand up. In addition, appellant contends J. did not go for follow-up treatment. Appellant also claims J. did not testify about the extent of her pain, whether it was acute or resulted in substantial suffering, how long it lasted, whether she was prescribed pain pills or whether her injuries, other than her missing tooth, lasted longer than a day. Appellant further argues J. did not testify she was seriously temporarily or permanently disfigured, or that she was temporarily or permanently substantially incapacitated.

{¶ 54} In the alternative, appellant contends if he did inflict serious physical harm, he did not do so knowingly. Appellant observes J. testified she knew appellant punched her once because she fell down. Appellant submits in order to be convicted, the jury had to find that when appellant punched J. he knew that serious physical harm was a probable consequence. Appellant maintains the surrounding circumstances should be considered,

18.

such as height, weight and age of the parties. Appellant claims the record contains evidence regarding J.'s size and age, but no evidence as to his physical stature.

{¶ 55} The state counters J. testified at trial that she lost consciousness after appellant hit her in the face, she was taken to the hospital by ambulance and received treatment for her injuries. The state argues J. testified she left the hospital against medical advice and returned the next day because she was light-headed and could not stand up. The state claims J.'s medical records and photographs depict J.'s injuries including bruises on her face, neck and arm, a missing tooth and scratches.

{¶ 56} The state also argues J.'s injuries were not consistent with one punch. J. had bruises all over her body and her children told medical personnel that appellant kicked J. in her back and stomach while she was unconscious. In addition, the state notes a detective testified J. told him that appellant had dragged her through the house, and the detective observed marks on J.'s neck "as if he had her by the neck."

**Law**

{¶ 57} R.C. 2903.11(A)(1) defines the offense of felonious assault and provides that "[n]o person shall knowingly * * * [c]ause serious physical harm to another." "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). Serious physical harm is defined as "[a]ny physical harm that involves some permanent incapacity, whether partial or total, or * * * some temporary, substantial incapacity; [a]ny physical harm that involves some permanent disfigurement or * * * some temporary,

19.

serious disfigurement; [or] [a]ny physical harm that involves acute pain of such duration as to result in substantial suffering or * * * any degree of prolonged or intractable pain." R.C. 2901.01(A)(5)(c)-(e).

{¶ 58} The "knowingly" element may be established, absent a confession, by considering all of the surrounding facts and circumstances. *See State v. Adams*, 4th Dist. Ross No. 94 CA 2041, 1995 Ohio App. LEXIS 2551, *10 (June 8, 1995).

{¶ 59} With respect to the "serious physical harm" element, evidence that a victim suffered injuries which required the victim to seek medical care has been held sufficient to support a finding of "serious physical harm" under R.C. 2901.01(A)(5). *See State v. Jones*, 6th Dist. Lucas No. L-08-1001, 2009-Ohio-6501, ¶ 28; *State v. Lee*, 6th Dist. Lucas No. L-06-1384, 2008-Ohio-253, ¶ 30.

**Analysis**

{¶ 60} Upon review of all of evidence presented at trial, in a light most favorable to the state, we find that any rational trier of fact could have found the essential elements of felonious assault proven beyond a reasonable doubt. The state offered evidence which, if believed, was adequate to demonstrate that appellant knowingly hit J. in the mouth, causing injuries and prompting her to fall and lose consciousness, then appellant knowingly kicked J. while she was unconscious on the ground, which caused pain to J.'s abdominal and back areas. Moreover, J. had her front tooth knocked out, she had a swollen face, bloody and cut lips, bruises on her face and arms, and scratches on her face and neck. J. also suffered from headaches, light-headedness, nausea and abdominal pain

20.

and sought medical treatment at the hospital on two successive days. We therefore conclude there was sufficient evidence to support appellant's felonious assault conviction.

{¶ 61} In addition, upon examining the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of the witnesses, we find nothing to indicate the jury lost its way and committed a manifest miscarriage of justice in convicting appellant of the felonious assault of J. We therefore conclude appellant's conviction was not against the manifest weight of the evidence. Accordingly, appellant's second assignment of error is not well-taken.

### First Assignment of Error

{¶ 62} Appellant argues his bribery convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. Appellant contends his convictions were related to jail phone conversations he had with J. on January 27 and March 3, 2017. Appellant observes the state must prove he acted purposely to secure a conviction. Appellant notes although J. testified he offered her money not to come to court, J. did not take the offer seriously.

{¶ 63} The state counters the evidence established that on two occasions in recorded jail calls, appellant offered J. $1,500 if she did not show up at court, and appellant mentioned several times, "no face, no case." The state submits, pursuant to R.C. 2901.22(A), "a person acts purposely when it is the person's specific intention to cause a certain result." Thus, the state maintains it did not need to prove that J. took

21.

appellant's offer seriously because the offense focuses on appellant's acts, not J.'s conduct.

**{¶ 64}** The record reveals that in recorded jail phone calls between appellant and J., which were played for the jury at trial, appellant repeatedly asked J. and told J. not to come to court. Appellant also offered J. money not to come to court. During the recorded calls between appellant and J., appellant said, "You gonna come to court? * * * I got $1500 to say you don't. * * * You are better not showing up. * * * No face no case. * * * I can pay you not to show up. * * * You don't need to show up to court, dude." In another recorded jail call, between appellant and B., a girlfriend, appellant asked, "So what my baby mama say [sic]? Man, we gotta get the girl not to show up to court, man."

**{¶ 65}** Appellant testified and admitted it was his voice on the jail calls. Appellant agreed it was his voice saying to J. you better not show up, but he said it was just jail talk.

**{¶ 66}** J. testified she did not take appellant's offer of money seriously "[b]ecause people talk, people just talk, jail talk." Plus, appellant did not have a job or any money.

### Law

**{¶ 67}** Pertinent to this case, the offense of bribery is set forth in R.C. 2921.02(C), which states:

> No person, with purpose to corrupt a witness or improperly to influence a witness with respect to the witness's testimony in an official proceeding, either before or after the witness is subpoenaed or sworn, shall

22.

promise, offer, or give the witness or another person any valuable thing or valuable benefit.

**Analysis**

{¶ 68} Viewing appellant's recorded jail calls, as well as all of the evidence presented at trial, in a light most favorable to the state, we find any rational trier of fact could have found the essential elements of bribery proven beyond a reasonable doubt. Therefore, we conclude there was sufficient evidence to support appellant's bribery convictions.

{¶ 69} Upon review of the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of the witnesses, we find nothing in the record to indicate that the jury lost its way and committed a manifest miscarriage of justice in convicting appellant of two counts of bribery. We therefore conclude appellant's convictions were not against the manifest weight of the evidence. Accordingly, appellant's first assignment of error is not well-taken.

{¶ 70} The judgments of the Lucas County Court of Common Pleas are affirmed. Costs of this appeal are assessed to appellant pursuant to App.R. 24.

Judgments affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.             _____

                                                           JUDGE

Thomas J. Osowik, J.         

                                                     _____

Christine E. Mayle, P.J.                                       JUDGE
CONCUR.

                                                           _____

                                                           JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.